IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LEROY T. GABALDON,

      Plaintiff,

v.                                      No. CIV 02-0822 LH/LCS

JO ANNE B. BARNHART,
ACTING COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

      **THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 9), filed July 10, 2002.  The Commissioner of Social Security issued a final decision denying Plaintiff's application for disability insurance benefits.  The United States Magistrate Judge, having considered the Motion, memoranda, administrative record, and applicable law, finds that the motion is well-taken and recommends that it be **DENIED**.

### PROPOSED FINDINGS

      1.      Claimant filed his original application for disability, disability insurance benefits, and supplemental security income on April 18, 1995, alleging disability since December 22, 1994. R. at  53; 59.  The Social Security Administration denied his claim and on reconsideration, Claimant filed a request for hearing.  R. at 59.    The Administrative Law Judge (ALJ) held a hearing on the merits on March 4, 1996, in Albuquerque, NM, at which Claimant was surprisingly

not present, despite the fact that he had notice, and was represented by a non-attorney.[1]  *Id.*

  1.  On May 9, 1997, the ALJ issued his decision and determined that the Claimant

met the disability insured status requirements of the Social Security Act on December 22, 1994

and continued to meet them through December  31, 1999.  R. at 62.  The ALJ also found that the

Claimant began post-onset substantial gainful activity, not covered by a trial work period,

effective August 17, 1996 and that Claimant's disability ceased on that date.  *Id.*  The ALJ next

found that medical evidence of record established that Claimant had severe chronic hepatitis C,

chronic back and knee pain, and hypertension; but that he did not have a physical impairment or

combination of impairments listed in or medically equivalent to one listed in the Listing of

Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599.  R. at 62.  The ALJ did

find that the Claimant's mental impairment met the requirements of Section 12.04 of the Listing of

Impairments and precluded him from working from December 22, 1994, through August 17,

1996. R. at 63.  The ALJ, therefore, determined that Claimant was disabled within the terms of §

1614 (a)(3) of the Social Security Act from December 22, 1994 though August 17, 1996. *Id.*

  3.  Claimant, now age 49, applied for Social Security Disability Insurance benefits on

October 29, 1997, alleging a disability which commenced September 11, 1997, due to major

depression, hepatitis C, chronic back pain, hypertension, and anxiety/panic attacks.  R. at 94, 120.

Claimant is a college graduate and received a degree in social work.  R. at 82. His prior relevant

work was as a mental health technician, drug and alcohol counselor, and probation officer.  R. at

31; 82.

  4.  Claimant's application for disability benefits was denied at the initial level on

---

[1]Micki Kindley, a non-attorney, spoke on behalf of the Plaintiff.  R. at 59.

2

January 27, 1998, and at the reconsideration level on September 25, 1998.  R. at 70; 76.  Plaintiff appealed the denial of his application by filing a Request for Hearing by an ALJ on November 11, 1998.  R. at 79.  The ALJ held a hearing on July 28, 1999, at which Claimant appeared and was represented by another non-attorney.[2]  R. at 16.

5.      The ALJ issued her decision on October, 14, 1999, (R. at 16-20), analyzing Claimant's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan*, 987 F. 2d 1482, 1487 (10th Cir. 1993).  At the first step of the sequential analysis, the ALJ found that Claimant had not engaged in substantial gainful activity during the period under review because Claimant's work activities were unsuccessful work attempts or part time in nature, and did not constitute the hours or earnings indicative of substantial gainful activity.  R. at 16.  At the second step, the ALJ determined that Claimant had severe impairments consisting of hepatitis C and depression. R. at 19.  At the third step of the sequential analysis, the ALJ found that the severity of Claimant's impairments or combination of impairments did not meet or equal any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-404.1599.  R. at 16-17.  The ALJ then found that Claimant had the residual functional capacity (RFC) for at least simple, unskilled light work activities which would require only short periods of concentration, which would allow him to work either alone or with only small numbers of coworkers, and which would allow him the opportunity to alternate sitting, standing and walking throughout the workday as needed.  R. at 18.   At step five, the ALJ relied on vocational expert testimony who indicated that there are a number of jobs existing in

---

[2]Ray Sorenson, a non-attorney, advocated for Mr. Gabaldon in place of Micki Kindley.  R. at 28.

significant numbers in the regional or national economies which the claimant could perform.  R. at 19.  Thus, the ALJ concluded that Claimant was not disabled within the meaning of the Social Security Act.  *Id*.

6.      Claimant's attorney filed a request for review of the ALJ's decision on October 27, 1999, and submitted a letter to the Appeals Council.[3]  R. at 10-11.  On June 21, 2002, the Appeals Council, after considering the contentions raised in the letter, denied the request for review.  R. at 7-8.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  On July 2, 2002, Claimant filed this action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405 (g).  Compl. ¶¶ 1-3.

**Standard of Review**

6.      The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the ALJ applied correct legal standards.  *See Hamilton v. Sec'y of Health and Human Servs,* 961 F. 2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if  "a reasonable mind might accept [it] as adequate to support a  conclusion."  *Andrade v. Sec'y of Health and Human Svcs.*, 985 F. 2d 1045, 1047 (10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F. 2d 407, 414 (10th Cir. 1983) (citation omitted)).  A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record.  *See Gossett v. Bowen*, 862 F. 2d 802, 805 (10th Cir. 1988).

7.      In order to qualify for disability insurance benefits or supplemental security

_____

[3]On October 27, 1999, Claimant hired Michelle Baca, an attorney, to represent him. R. at 24.

income, a claimant must establish a severe physical or mental impairment expected to result in

death or last for a continuous period of twelve months which prevents the claimant from engaging

in substantial gainful activity.  *Thompson*, 987 F. 2d at 1486 (10th Cir. 1993) (citing 42 U.S.C. §

423 (d)(1)(A)).  At the first four levels of the sequential evaluation process, the claimant must

show that he is not engaged in substantial gainful employment, he has an impairment or

combination of impairments severe enough to limit his ability to do basic work activities, and his

impairment meets or equals one of the presumptively disabling impairments listed in the

regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had

done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the

burden of proof shifts to the Commissioner to show the claimant is able to perform other

substantial gainful activity considering her residual functional capacity, age, education, and prior

work experience.  *Id.*

**<u>Administrative Record</u>**

8.      The most recent favorable decision was the ALJ decision issued on May 9, 1997.

R. at 59-63.    The ALJ considered a closed period of disability and determined that the Claimant

was disabled from December 22, 1994 through August 17, 1996.  *Id*. The ALJ noted that

Claimant's representative advised that Claimant began working as a special education teacher on

August 17, 1996, and at a mental health facility when needed.  *Id*.  The ALJ found that "this work

activity requires significant physical and mental activities, for which Claimant is being paid, and

the work constitutes substantial gainful activity."  *Id*.  Therefore, the ALJ determined that

Claimant's disability ceased on August 17, 1996.  R. at 59-60.

9.      The ALJ also found that during the closed period that the Claimant was affected

in his ability to perform work activity by the following physical and mental impairments: hepatitis C, chronic back and knee pain, and hypertension.  R. at 60.  The ALJ found that the physical impairments, singly or in combination, did not meet or equal in severity any disorder set forth in the Listing of Impairments.  *Id*.   The ALJ did find that the Claimant manifested several signs and symptoms for diagnostic criteria listed for depressive syndrome: anhedonia[4] and decreased motivation; sleep disturbance, especially without medication; decreased energy; feelings of guilt and worthlessness; and difficulty concentrating and thinking.  R at 60; 64.  The ALJ determined that the Claimant had a mental impairment and concluded that Claimant encountered deficiencies in concentration, persistence or pace, resulting in failure to complete tasks in a timely manner.  R. at 61-62; 64.  The ALJ further found evidence of two documented episodes of deterioration or decompensation in a work or work-like setting, which caused Claimant to withdraw from the situation or to experience exacerbation of signs and symptoms, during the closed period.  R. at 62.  Therefore, the ALJ concluded that Claimant's mental impairment met the requirements of Listing 12.04 and precluded him from working during the closed period.  *Id*.   The ALJ also concluded that Claimant's entitlement to supplemental security income depended on whether the non-disability requirements for Title XVI eligibility were satisfied.  *Id*.

10.     In an undated disability report, Claimant wrote that he was suffering from major depression, hepatitis C, chronic back pain, hypertension, anxiety and panic attacks.  R. at 120.  Claimant noted that prior to 1994, he was a drug and alcohol counselor until he got sick.  *Id*.  Claimant recommenced work in August 1996 as a substitute teacher for Albuquerque Public

---

[4]Anhedonia is the absence of pleasure from the performance of acts that would ordinarily be pleasurable.  *See Stedman's Medical Dictionary*, 90 (26th ed. 1995)

Schools (APS).  *Id.*  Claimant stated that he was not able to work because in August-September

1997 he "became very chronically depressed and would not even show up for work at all."  *Id.*

He was terminated from APS on October 2, 1997 for three no-shows.  R. at 126.  Claimant stated

that his condition kept him from working because he had "been extremely depressed again [and]

disorganized."  R. at 120.  He wrote that he was extremely depressed, found himself afraid to

leave his home, and that he cried a lot.  *Id.*  Claimant also stated that he experienced weight

fluctuations, slept during the day, and did not sleep at night.  *Id.*  Mr. Gabaldon reported that he

was taking Buspar[5], Trazadone[6], Prinivil[7], Tylenol, Motrin, and Prilosec[8].  R. at 121.  He wrote

that he was hospitalized in 1994-1995 due to depression and liver problems.  R. at 122.  In the

activity section of the report, Mr. Gabaldon stated that his doctor told him to "avoid stress [and]

no work."  R. at 123.  He stated that he does no household maintenance and won't leave his

house.  *Id.*  He visited with his daughters once a week and he found time to drive his car.  *Id.*

      11.    A consultative examination was performed by Dr. G. Michael Dempsey on May

---

[5] Buspar is a brand of buspirone, an anti-anxiety medication.  WebMD, *Medical Information*; *Drugs and Herbs* (Feb. 18, 2003), *available at* http://my.webmd.com/content/drugs/1/404.

[6]Trazadone is an anti-depressant medication.  WebMD, *Medical Information*; *Drugs and Herbs* (Feb. 18, 2003), *available at* http://my.webmd.com/content/drugs/1/4046.1744.

[7]Prinivil is a brand name of lisinopril.  Lisinopril is in a class of drugs called angiotensin-converting enzymes (ACE) inhibitors and is used to lower blood pressure, to treat congestive heart failure, and to improve a survival rate after a heart attack.  WebMD, *Medical Information*; *Drugs and Herbs* (Feb. 18, 2003), *available at* http://my.webmd.com/content/drugs/1/4046.2009.

[8]Prilosec is a brand name for the drug omeprazole.  Omeprazole decreases the amount of acid produced in the stomach.  It is used to treat ulcers. WebMD, *Medical Information*; *Drugs and Herbs* (Feb. 18, 2003), *available at* http://my.webmd.com/content/drugs/1/4046.2104.

17, 1996.  R, at 160.  At the time, Mr. Gabaldon was taking hydroxyzine,[9] Tylenol, Buspar,

Prinivil , Methocarbamol,[10] Maalox,[11] aspirin, trazadone, omeprazole, and mycelex.[12]  R. at 160.

In the work setting portion of his report, Dr. Dempsey indicated that Claimant's last employment

was in 1994 as a social worker and counselor.  R. at 161.  Mr. Gabaldon told Dr. Dempsey that

he was not able to work because of depression and chronic back pain.  *Id.*  Claimant stated that he

lived in his apartment by himself; he did his own cooking; had no social activities; did not attend

church; he did not visit with relatives; he occasionally visited with neighbors; and at times he did

arts and crafts when he had the energy and interest.  *Id.*  Mr. Dempsey stated that on the Jacobs

test, Mr. Gabaldon performed well and did not miss any of the thirty items.  R. at 162.  Dr.

Dempsey diagnosed Mr. Gabaldon with depression, possibly secondary or associated with general

medical condition and medication under Axis I[13].  *Id.*  He did not diagnose Mr. Gabaldon under

---

[9]Hydroxyzine depresses activity in the central nervous system (brain and spinal cord), which causes relaxation and relief from anxiety.  Therefore, hydroxyzine is used to treat anxiety disorders and tension in stressful situations.  It may also increase the effects of other medicines, such as pain relievers and sedatives.  WebMD, *Medical Information; Drugs and Herbs* (Feb. 18, 2003), *available at* http://my.webmd.com/content/drugs/3/4046.1273.

[10]Methocarbamol is a muscle relaxant and works by blocking nerve impulses that are sent to the brain.  WebMD, *Medical Information*; *Drugs and Herbs* (Feb. 18, 2003), *available at* http://my.webmd.com/content/drugs/1/4046.1622.

[11]Maalox is a form of loperamide.  It slows the rate at which the stomach and the intestines move.  WebMD, *Medical Information*; *Drugs and Herbs* (Feb. 18, 2003), *available at* http://my.webmd.com/content/drugs/1/4046.1284.

[12]Mycelex is a form of clotrimazole topical and is used as an antifungal medication.  WebMD, *Medical Information*; *Drugs and Herbs* (Feb. 18, 2003), *available at* http://my.webmd.com/content/drugs/1/4046.1631.

[13]The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* 25-30, (4th ed. 1994).

Axis II.  *Id*.  He diagnosed Mr. Gabaldon with general medical conditions including hepatitis C, hypertension, and antihypertensive medications, all of which have adverse effects on mood under Axis III.  *Id*.  Under Axis IV, Dr. Dempsey stated that Mr. Gabaldon's psychosocial stressors were severe and include estrangements from family, unemployment, and chronic physical and mental illness.  *Id*.  Under Axis V, Dr. Dempsey stated that Mr. Gabaldon's GAF appeared to be around 55, with significant impairment in social and occupational functioning.[14] *Id.*  Using the AMA Guides to Impairment, Dr. Dempsey observed that Mr. Gabaldon activities of daily living were moderately impaired  because he was able to bathe, dress, and feed himself, but apparently only at marginal levels.  R. at 162-163.  He also felt that Mr. Gabaldon's social functioning  was severely impaired, probably precluding any useful occupational functioning because he was estranged from his family, had no close friend that he saw on a regular basis and maintained only minimal contact with his children. R. at 163.  Dr. Dempsey opined that Mr. Gabaldon's concentration, persistence, and pace were moderately impaired because he actually was able to concentrate and persist relatively well during the examination, but that he reported very little interest in usual hobbies or other activities. *Id*.  Finally, Dr. Dempsey concluded that Mr. Gabaldon's adaptation to stress was severely impaired because he was irritable and anxious, even without being exposed to stressors, such as work deadlines or criticism from supervisors.  *Id*.

      12.     On November 10, 1997, Mr. Gabalon's counselor, Kathleen Slattery, diagnosed

---

[14]The GAF rates the client's "psychological, social, and occupational functioning." *See supra n. 13* at 30.  The DSM-IV defines a GAF of 51-60 as moderate symptoms (e.g. flat effect, circumstantial speech, and occasional panic attacks) or moderate difficulty in social occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). *Id*. at 32.

him with panic disorder and depressive disorder under Axis I, did not diagnose him under Axis II, diagnosed him with hepatitis C and L4 fracture in Axis III, and determined that he had moderate, occupational, close relationships under Axis IV.  R. at 228.  She wrote that he had a GAF score of 60.  *Id*.  She noted that he had a good relationship with his daughters and a solid support system and that he has several close friends and maintains an amicable relationship with his ex-wife.  *Id*.  She also noted that he enjoys being alone, but opined that he isolates himself too much. *Id*.  On December 4, 1997, Mr. Gabaldon told her that he spent most of his time in his apartment watching either the history channel or rented movies.  R.at 224.  He said that he preferred being alone and often avoids others, including his children by not answering the phone or door for several weeks at a time.  *Id*.  He told her that he visited a McDonald's restaurant a few times a day for his meals and that he visited a girl friend over a weekend except he had a panic attack while driving back from her place.  *Id*.  She diagnosed him with a panic disorder with agoraphobia and started him on desipramine.  R. at 224-225.  He was taking buspirone, trazodone, lisinopril, cisapride[15], lansoprazole[16], ibuprofen, and methocarbanol.  R. at 226.

13.     Mr. Gabaldon was notified in two undated letters that his reconsideration for disability benefits and supplemental security income were denied.  R. at 68-69.   The determination of his claim was made by the Social Security Administration based on the Veterans Administration ("VA") Medical Records from January 4, 1996 to January 18, 1996, Dr. G.

---

[15]Cisapride is used to increase the rate at which the esophagus, stomach, and intestines move during digestion.  It is normally used to treat heartburn.  WebMD, *Medical Information*; *Drugs and Herbs* (Feb. 18, 2003), *available at* http://my.webmd.com/content/drugs/1/4046.1646.

[16]Lansoprazole is used to decrease the amount of acid produced in the stomach.  WebMD, *Medical Information*; *Drugs and Herbs* (Feb. 18, 2003), *available at* http://my.webmd.com/content/drugs/1/4046.2019.

Michael Dempsey's consultative examination on May 17, 1996, and the VA Regional Office records from December 5, 1990 to November 6, 1995. *Id*. The letters indicated that the medical evidence showed that he had a history of hiatal hernia and gastrointestinal problems which caused him some discomfort, but did not limit his ability to work. *Id*. The letters also indicated that his hepatis was moderately active and caused him some fatigue, but did not prevent him from doing normal daily activities. *Id*. The letters summarized that his high blood pressure was controlled with regular medical treatment and proper use of prescribed medications and that he was under regular treatment for depression, anxiety, and post traumatic stress disorder ("PTSD") *Id*. The letters also indicated that his condition did not seriously affect his overall ability to communicate his thoughts, follow simple instructions, maintain a daily routine of activities or relate to others in general. *Id*. It was also determined that because of his age, education, and mental and physical capability, that he should be able to do simple routine work in a nonpublic setting. R. at 69.

14.     On November 13, 1997, Claimant filed an initial disability determination with a state agency. R. at 65. Dr. Aida Recalde, a reviewing physician, diagnosed Claimant with hepatitis C and major depression and determined that Claimant was not disabled on January 27, 1998. *Id*. Dr. Recalde's original determination was affirmed by Dr. Geoffrey Sutton on September 22, 1998. R. at 67.

15.     On January 27, 1998, Horace Dickerson, a Social Security Regional Commissioner wrote to Mr. Gabaldon to notify him that his application for retirement, survivors, and disability insurance benefits was denied. R. at 70-73. Various reports were used in making the decision by doctors and other trained staff. R. at 71. The reports that were used to make this determination were the V.A. Medical Center (VAMC) records from September 4, 1996 to December 4, 1997

11

and a September 17, 1996 psychiatric examination by Dr. Michael Dempsey.  R. at 70.  The letter

indicated that the Claimant had emotional distress as a result of depression and anxiety.  *Id.*  Mr.

Dickerson opined that with continued medical/psychological care and adherence to his treatment

plan and time for emotional stabilization that Claimant's impairment was not expected to last a

consecutive 12 months or be totally disabling. *Id.*  Mr. Dickerson also noted that the Claimant

would be able to perform routine activities of daily living, such as bathing, dressing, housework,

shopping, and that he was able to drive a vehicle, and make and keep appointments.  *Id.*  Mr.

Dickerson observed that the Claimant's physical problems would not prevent him from working

and added that although he would not be able to perform all types of work, by September 1998 he

should be able to do work that does not require extensive social interaction or require him to lift

heavy loads.  *Id.*  He concluded by stating that based on the Claimant's age, education, and mental

and physical capability, the Claimant should be able to perform a variety of medium level, non-

public jobs available in the national economy by September 1998.  *Id.*

16.     Mr. Gabaldon submitted a Request for Reconsideration on March 30, 1998 of the

January 27, 1998 decision.  R. at 74.  Mr. Gabaldon stated that he still suffered from severe major

depression; panic and anxiety attacks; and physical problems due to hepatitis C, low back pain and

extreme fatigue.  R. at 76.

17.     A consultative examination was performed by Dr. G. Michael Dempsey on

September 9, 1998.  R. at 188-192.  In his report, Dr. Dempsey indicated that Claimant's last

employment was as a day laborer nine months before September 9, 1998. R. at 189.  Dr.

Dempsey reported  that Claimant stated that he cannot work because of pain and weakness in his

back and legs and because he can not deal with supervision.  R. at 189.  Dr. Dempsey indicated

that the Claimant lives in an apartment by himself; pays his own bills; seldom cooks; does not drive any more; stopped working on arts and crafts in the past year; denies any social activities; and occasionally attends church, but does not visit with relatives, neighbors or friends.   R. at 190. Dr. Dempsey stated that the claimant described his typical activities as including the following routine:  waking up around 2:00 p.m., snacks, watching television through the evening, and going bed at around 10:00 p.m. to midnight, but not getting to sleep until around 2:00 a.m.   R. at 190. Dr. Dempsey opined that the Claimant may have some sort of cognitive disorder because the Claimant missed 12 out of 30 items on the Jacob's test.  R. at 191.  Dr. Dempsey diagnosed Claimant with depression, with bipolar features and panic disorder and agoraphobia under Axis I. *Id*.  He did not diagnose claimant under Axis II.  *Id*.  He diagnosed Claimant with hepatitis-C and hypertension under Axis III  and diagnosed him with severe psychosocial stressors that included estrangement from family, unemployment, and chronic physical and mental illness under Axis IV. *Id*.  Dr. Dempsey diagnosed Claimant with a global assessment of functioning (GAF) of 50 to 55 under Axis V.  *Id*.  Dr. Dempsey then rated the Claimant's psychiatric impairment by using the AMA Guides to Impairment.  *Id*.  He opined that the Claimant appeared to be able to manage his own funds and appeared to have at least moderate impairment in his activities of daily living because he stays home and does not drive an automobile.  R. at 191-192.  He also opined that the Claimant had a marked impairment with respect to social functioning because the Claimant reported no social functioning and is estranged from his immediate family.  R. at 192; 194. Finally, Dr. Dempsey felt that the Claimant had a marked impairment in the areas of

concentration, persistence, pace, and adaptation to stress[17]. R. at 192-194.

18.     On September 16, 1998, a psychiatric review technique form (PRTF) was completed by  G.W. Sutton, M.D, a non-treating, non-examining physician. R. at 197.  Dr. Sutton's medical disposition indicated that the Claimant needed an RFC assessment because there was a severe impairment present which did not meet or equal a listed impairment.  *Id*. The medical disposition was based upon Dr. Sutton's opinion that the Claimant had an affective disorder and anxiety related disorders. R. at 197; 200-201.  Dr. Sutton indicated that the Claimant had slight to moderate restrictions of daily living and moderate limitation in maintaining social functioning.    R. at 204. Dr. Sutton also indicated that the Claimant often experienced deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner.  *Id*.  The PRTF indicated that there was insufficient evidence to determine whether or not there were episodes of deterioration or decompensation in work or work-like settings which cause the Claimant to withdraw from that situation or to experience exacerbation of signs and symptoms.  *Id*.  Dr. Sutton opined that Claimant was capable of simple, routine work with a low public setting and that the possibility of working in a public setting was not precluded.  R. at 198.

19.     On May 4, 1998, the VA determined that Mr. Gabaldon's hepatitis was 60 percent disabling, but that he was not entitled to individual unemployability.  R. at 208.  The rationale for this determination was that the examining physician offered the opinion that Mr. Gabaldon was not totally unemployable due to his service-connected hepatitis.  *Id*.  The VA examiner referred to

---

[17]A marked impairment is a standard for measuring the degree of a functional limitation. It means more than moderate but less than extreme.  A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with one's ability to function independently, appropriately, effectively, and on a sustained basis.  *See* 20 C.F.R. §§ 404.1520 (a); 416.920 (a).

a nervous disorder and alcohol abuse as the primary contributors to the claimant's poor employment history.  *Id*.  On October 19, 1998, David Bear from the Department of Veteran Affairs notified Mr. Gabaldon that his request for VA benefits was denied.  R. at 207.

20.     On October 6, 1997, Dr. Maurice Rol, a VA staff psychiatrist, noted that claimant reported that he attempted to work part-time, but had been fired.  R. at 235.  In April 1998, another VA staff psychiatrist noted that Mr. Gabaldon lost his parole officer position due to poor work attendance and sleeping on the job.  R. at 244.  The psychiatrist also noted that the claimant reported being fired from a job as a substance abuse counselor for similar reasons.  *Id*.  In May 1998, Dr. Rol said that the claimant's anxiety was lessening and claimant's current medications were working well.  R. at 270.

21.     On June 24, 1998, Mr. Gabaldon told Sharon Conner, a VA nurse,  that his support systems were the Veterans Affairs Medical Clinic ("VAMC") and his two daughters.  R. at 268.  He also told the nurse that he was currently employed at Charter Heights as a psychology tech.  *Id*.  Claimant told the nurse that "he does not like the job and wants assistance finding something else that [had] less interaction with people."  *Id*.  The nurse noted that Claimant was alert, oriented, developed good coping skills,  and that he had an intact memory.  R. at 269.

22.     On that same day, Mr. Gabaldon also told Stephen Lewis, a VA staff physician, that the current medications were the most effective combination that he tried.  R. at 266.  He had some depression during most days, but never more than half the day.  *Id*.  Dr. Lewis also wrote that Plaintiff reported feeling overwhelmed when he tried to work, that he saw his two children "fairly frequently,"  but that he had little regular social contact.  *Id*.  Claimant reported fatigue several times from April 1997 through January 1999 but was never diagnosed with fatigue.  R. at

221, 233, 244, 262-263, 266, 302, 303.  During this same period, there were also 13 reports of

"no shows" for doctors' appointments at the VAMC.  R. at 213, 214, 215, 219, 220, 270, 273.

23.     On February 3, 1999, Stephanie Fallon, a VA employee, interviewed Mr.

Gabaldon for a compensation and pension exam report.  R. at 278-281.  Claimant told her that he

did not have much contact with his children  and that he could not concentrate.  R. at 280.  Ms.

Fallon also found the claimant to be alert and oriented and noted that his thinking was linear and

his memory was normal.  *Id*.  She also found that he had an impaired ability to function socially

and that he reported feelings of anxiety.  *Id*.  Ms. Fallon reported that Claimant's GAF was 55,

with the following comment:

> While this patient's hepatitis C may contribute to his depression
> with fatigue, tiredness and depressed mood, his GAF score is
> based on his social functioning and his inability to function
> socially, his isolation and estrangement from his family, his anger
> and history of trouble with the law and inability to keep jobs.

R. at 280.  In February and June 1999, Mr. Gabaldon was reassessed at VAMC, and given a GAF

of 45.  R. at 287, 293.

24.     On August 18, 1999, Dr. Irene Ortiz of Rehabilitation Services & Veterans

Programs examined Mr. Gabaldon and determined that he had an affective disorder and evidence

of a personality disorder. R at 315-320.  Dr. Ortiz found that Mr. Gabaldon experienced a

depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all

activities, sleep disturbance, psychomotor agitation or retardation, decreased energy, and

difficulty concentrating or thinking.  R. at 317.  Dr. Ortiz also reported that Mr. Gabaldon also

had symptoms of a personality disorder, namely seclusiveness or autistic thinking, pathologically

inappropriate suspiciousness or hostility, persistent disturbances of mood or affect, and intense

and unstable interpersonal relationships and impulsive and damaging behavior.  R. at 320.  Dr. Ortiz found that Claimant had a moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, seldom displayed deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and that there was insufficient evidence to demonstrate episodes of deterioration or decompensation in work or work-like settings which caused him to withdraw from such situations.  R. at 320-321.

25.     The Claimant testified at a hearing before the ALJ on July 28, 1999 and was represented by Ray Sorenson, a non-attorney.  R. at 28.  Claimant testified that he graduated from high school and college and received a degree in social work.  *Id*.  Claimant testified that he was last employed as a mental health technician, which required him to supervise patients and socialize with them, from August 1997 through July 1998.  *Id*.  His basic duties included watching patients smoke, making sure that they did not hurt themselves and talking to the patients.  R. at 29-30.  Claimant testifies that the job ended because he had a poor performance and a negative attitude.  R. at 30.  He testified that his energy in the job wasn't fitting into the supervisors' idea of a good psych tech.  *Id*.  He also testified that he took advantage of the opportunity not to do anything and always had to be told what to do. *Id*.  He further testified that he had problems with the nursing [staff], their attitudes, and his attitude about dealing with people.  *Id*.  Instead he would sit at work and smoke cigarettes. *Id*.   As a psych tech, the heaviest items that he was required to lift were the patients when they fell down, fainted, or needed to be cleaned. R. at 45-46.

26.  Mr. Gabaldon then testified that he was also a teacher and that he also worked as a drug and alcohol manager in Tucson, Arizona.  R. at 31-32.  He testified that when he was in Tucson he had the same problems that he had as a psych tech.  R. at 31.  Claimant testified that he

had an attitude, felt isolated, and did not feel like he was part of a team.  *Id*.  He stated that he did

what he wanted to do because his energy levels were not there and that he slept a lot in his office.

R. at 31-32.  Claimant testified that he was terminated from his position because he was charged

with aggravated assault with a deadly weapon and was extradited from Tucson and given a

deferred sentence of one year of probation.  R. at 32-33.  The heaviest items that he lifted were

files, supplies, and boxes as a drug and alcohol manager.  R. at 46.  As a teacher, he sometimes

had to carry whatever materials were needed for class and that he had difficulty as a PE coach.

*Id*.  Mr. Gabaldon also testified that he tried to work at a simple job, but that he could not sustain

one and that he was tired of failing.  R. at 39.

      27.    Mr. Gabaldon testified that he never used drugs or alcohol and that he had

hepatitis C.  R. at 35.  He testified that he has gastrointestinal problems and that "his energy level

is nil."  *Id*.  He states that he gets "so unmotivated, tired, fatigue and . . . sleeping is hard."  *Id*.

      28.    Claimant also testified that his source of income was from the VA for hepatitis C

with secondary depression.  R. at 36.  He stated that his hepatitis C was service-connected and he

stated that he was diagnosed with unemployability because of his hepatitis C, meaning that there

was no chance for rehabilitation.  R. at 37.  Claimant indicated that he did everything at the VA

including a 90-day program and other therapy programs to help him deal with panic attacks and

his anti-social behaviors, but that he was currently not in an ongoing program.  R. at 37.

      29.    Mr. Gabaldon testified that his VA claims representative, John Richards, indicated

that although he had PTSD symptoms, his major disability was hepatitis, and that the PTSD could

be taken care of by counseling.  R. at 38.  Claimant stated that his PTSD symptoms included

anxiety, depression, and the fear of loss.  *Id*.  He stated that he did not have any friends and that

he had an "inability to deal with people." *Id.* Claimant also testified that he often had problems with his panic attacks caused by "living in a house, going to grocery stores, or getting from point a to point b" and that his panic attacks caused him to hyperventilate. R. at 39.

30.     Mr. Gabaldon also testified that he had always had back and knee problems since he injured his back while in the military and since anterior cruciate ligament (ACL) surgery on his knee. R. at 40. He stated that he had problems with bending and stooping and that his walking had to be limited to a couple of blocks. R. at 40-41. Claimant testified that he had a problem sitting because he gets fidgety, but that he can generally stay seated anywhere from five to 20 minutes before he needs to stand up and stretch. R. at 41-42. Claimant stated that his back hurts when he wakes up from laying on it all night. R. at 42. Mr. Gabaldon also testified that he can not stand very long because his left knee hurts and starts crackling at the joint. *Id.*

31.     Mr. Gabaldon testified that he eats out a lot at a Burger King and a deli. *Id.* He does not buy food because it does not appeal to him. *Id.* He testified that he would rather get a hamburger, eat it, and watch TV. *Id.* Claimant testified that he sleeps up to six to seven hours a day with Trazodone and stays groggy for two or three hours thereafter. *Id.* Claimant stated that he does not drive and travels via the bus. R. at 43. Claimant testified that his doctors have not limited him in any way. *Id.* Mr. Gabaldon testified that other than fatigue, he can lift up to 20 pounds and that his knee locks when he bends down. *Id.* Mr. Gabaldon also testified that he does not have hobbies and that he does not have the concentration to read. R. at 44.

32.     Kevin J. Davis, the Vocational Expert (VE), testified at the hearing. R. at 44-45. The VE characterized Mr. Gabaldon's past work as a psych tech as medium and semi-skilled. R. at 46. The VE also characterized Mr. Gabaldon's work as a substitute teacher as light and skilled

and his work as a drug and alcohol counselor as sedentary and skilled.  R. at 46-47.

33.     The ALJ posed a hypothetical to the VE and asked him whether an individual that was of the same age, education, and work history as Mr. Gabaldon would have acquired any transferable skills.  R. at 47.  The VE testified that such an individual would have acquired skills in social services and adult care.  *Id*.  The ALJ then posed another hypothetical to the VE and asked whether there were any jobs that an individual of the same age, same education, same work history, and same transferable skills as the Claimant could do.  R. at 48.  The hypothetical was subject to limitations in sitting 30 to 40 minutes at a time, walking two blocks, standing for a short period of time, lifting and carrying no more than 20 pounds and subject to non-exertional factors such as difficulty in maintaining concentration, working in an environment or setting where the individual can work alone or basically in a small environment without large groups of people to deal with.  *Id*.  The VE testified that there were four such jobs in the national and local economy including coin collector, cleaner/housekeeper, ware cleaning, and light assembly positions including being an eyeglass polisher and a lens inserter.  R. at 48-50.  The VE testified that the coin collector position was light and unskilled, that the cleaner/housekeeping position was light and unskilled, that the ware cleaning position  was light and unskilled, that the eyeglass polisher position was sedentary and unskilled, and that the lens inserter position was sedentary and unskilled.  R. at 49-50.

## Discussion

34.     Claimant brings two issues before the Court.  He argues that the ALJ's finding that Mr. Gabaldon's mental impairment limits him only in that he is limited to performing work that requires short periods of concentration, which would allow him to work alone, or with small

numbers of workers, is not supported by substantial evidence and is contrary to law. Plaintiff also argues that the ALJ failed to assess the impact of Mr. Gabaldon's fatigue on his ability to work and that the ALJ's findings are unsupported by substantial evidence and is contrary to law. I find that the ALJ's opinion that Mr. Gabaldon's mental impairment limits him only in the sense that he is limited to performing work that requires short periods of concentration, which would allow him to work alone, or with small numbers of workers, is supported by substantial evidence and is not contrary to law. I also find that the ALJ did not err in her assessment of Mr. Gabaldon's fatigue.

**The Consultative Psychiatrist's Opinion**

35.     Plaintiff argues that acceptance of Dr. Dempsey's, the consultative psychiatrist, findings requires a conclusion that Mr. Gabaldon's mental impairment meets the Listing of Impairments and that the ALJ's finding that the consultative psychiatrist's opinion was afforded limited weight was ludicrous. Dr. Dempsey found that Claimant had a marked impairment with respect to social functioning because he reported no social functioning and was estranged from his immediately family. R. at 192. Moreover, Dr. Dempsey felt that the Claimant had a marked impairment in the areas of concentration, persistence, pace, and adaptation to stress. R. at 192-194. In *Cruse v. U.S. Dept. of Health & Human Servs*, 49 F.3d 614, 617 (10th Cir. 1995), the Tenth Circuit noted that:

> In order to meet the listing requirements under the Part B criteria regarding the severity of the impairment, the condition or impairment must result in at least two of the following:
> 1.     Marked restriction of activities of daily living; or
> 2.     Marked difficulties in maintaining social functioning; or
> 3.     Frequent deficiencies of concentration, persistence or pace resulting in frequent failure

4.     Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation (decompensation) or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

*Id.* 20 C.F.R. § 404.1520a(b)(3); Pt. 404, Subpt. P, App. 1, § 12.04 B. A marked impairment is a standard for measuring the degree of a functional limitation. *See* 20 C.F.R. §§ 404.1520 (a); 416.920 (a) It means more than moderate but less than extreme. *Id.* A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with one's ability to function independently, appropriately, effectively, and on a sustained basis. *Id.* Claimant argues that if the ALJ accepted Dr. Dempsey's evaluation, then the ALJ would be required to find that the Claimant was disabled. Claimant notes that Dr. Dempsey found him to have a marked impairment with respect to social functioning and found him to have a marked impairment in the areas of concentration, persistence, pace, and adaptation to stress.

36.     Instead of adopting Dr. Dempsey's conclusion, the ALJ concurred with Dr. Ortiz, Claimant's treating psychiatrist, whose opinions conflicted with those of Dr. Dempsey. This case thus presents "the not uncommon situation of conflicting medical evidence," a situation in which "[t]he trier of fact has the duty to resolve that conflict." *Richardson v. Perales*, 402 U.S.389, 399 (1971); *Casias v. Secretary of HHS*, 933 F.2d 799, 801 (10th Cir. 1991); *Tillery v. Schweiker*, 712 F.2d 601, 603 (10th Cir. 1983). A treating physician's opinion about the nature and severity of a claimant's impairments will be given controlling weight under certain

circumstances.  *See* C*astellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994). A treating physician may offer an opinion which reflects a judgment about the nature and severity of the claimant's impairments including the claimant's symptoms, diagnosis and prognosis, and any physical or mental restrictions. See id. §§ 404.1527(a)(2), 416.927(a)(2).  A treating physician's opinion generally is favored over that of a consulting physician. *Talbot v. Heckler*, 814 F.2d 1456, 1463 (10th Cir. 1987).  However, "[t]he treating physician rule governs the weight to be accorded the medical opinion of the physician who treated the claimant . . . relative to other medical evidence before the fact-finder, including opinions of other physicians." *Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir. 1987).  In this case, the ALJ serves as the trier of fact and has the duty to resolve the conflict between the consultative psychiatrist's opinion and the treating physician's opinion. *Richardson*, 402 U.S. at 399;  *Casias*, 933 F.2d at 801;  *Tillery*, 712 F.2d at 603.

37.     The ALJ determined that the opinion of the treating psychiatrist, Dr. Irene Ortiz of Rehabilitation Services and Veterans Programs, was consistent with the Claimant's treatment notes and, therefore, afforded Dr. Ortiz's opinion great weight.  R. at 17.  The ALJ noted that the opinion of the Consultative Examiner, Dr. Dempsey, was inconsistent with the opinions of the medical consultants, who could find no more than moderate limitations in the Claimant's work related functioning, and no evidence of any significant medical problem.  R. at 17; 160-163; 176-178;191-205; 315-322.  The ALJ, therefore, discounted Dr. Dempsey's opinion and gave greater weight to the opinion of Mr. Gabaldon's treating physician.  *Id* at 17.  Given the opinion of Dr. Ortiz and the record as a whole, substantial evidence supports the ALJ's decision to afford greater weight to Dr. Ortiz's opinion.

23

**Residual Functional Capacity**

38.    At step five, the burden of proof shifts to the Commissioner to show that the

claimant retains the residual functional capacity (RFC) to do work which exists in the national

economy.  *Thompson*, 987 F. 2d at 1487.    Where a claimant presents evidence of both exertional

and non-exertional impairments, the ALJ must make findings on how much a claimant's work

ability is further diminished by the non-exertional limitations.  *Id*.  The ALJ found that Claimant

had moderate difficulty in his social functioning and concentration and that his mental impairment

limits him only in the sense that he is limited to performing work that requires, simple, unskilled

light work activities.  R. at 17-18.  The ALJ found that such jobs require only short periods of

concentration, that would allow him to work alone, or with small numbers of coworker, and allow

the worker to alternate sitting, standing and walking as needed throughout the day.  R at 18, 23.

The ALJ based his decision on not only the treating physician's opinion and the medical

consultants, but also on the testimony of the vocational expert.  R. at 19.  The ALJ relied on the

fact that Claimant had slight restrictions on his daily living activities, noting that without

assistance Claimant prepared meals, paid bills, secured housing and generally took care of his

daily needs.  *Id*.

39.    The ALJ also found evidence that detracted from Claimant's credibility and

supported a finding of better social functioning than Claimant admitted[18].  R. at 17-18.  Since

_____

[18]One piece of evidence that remained inconsistent was the Claimant's testimony
regarding his drug and alcohol history.  On one occasion, a VA examiner referred to a nervous
disorder and alcohol abuse as the primary contributors to the claimant's poor employment history.
R. at 208.  Claimant later testified that he never used drugs or alcohol.  R. at 35.

    Another piece of evidence, which will be discussed in depth later, that detracts from
Plaintiff's credibility are his statements about his social functioning.  Specifically, the statements to

some of the evidence in the record is contradictory, the ALJ has the ability to resolve conflicts in the medical evidence. *Richardson* 402 U.S. at 399; *Casias v. Secretary of HHS*, 933 F.2d at 80; *Tillery*, 712 F.2d at 603. The ALJ's finding is supported by the opinion of Dr. Ortiz and the state medical examiners, and the record as a whole. R. at 17-18.

40. Dr. Ortiz found that the Claimant had a moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, seldom displayed deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and that there was insufficient evidence to demonstrate episodes of deterioration or decompensation in work or work-like settings which caused him to withdraw from such situations. R. at 320-321.

41. Dr. Sutton, a non-treating and non-examining physician, indicated that the Claimant had slight to moderate restrictions of daily living and moderate limitation in maintaining social functioning. R. at 204. He also indicated that the Claimant often experienced deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner. *Id*. The PRTF indicated that there was insufficient evidence to determine whether or not there were episodes of deterioration or decompensation in work or work-like settings which cause the Claimant to withdraw from that situation or to experience exacerbation of signs and symptoms. *Id*. Dr. Sutton found that Claimant was capable of simple, routine work with a low public setting and that the possibility of working in a public setting was not precluded. R. at 198.

42. Dr. Dempsey, the consulting physician found, on the other hand, that the Claimant was moderately or severely impaired in his social functioning, activities of daily living, ability to

---

various doctors regarding the relationship with his children and his ex-wife are inconsistent. R. at 17, 123, 225, 228.

concentrate, and adaptation to stress.  R. at 191-194.  Dr. Dempsey examined Claimant a second time and assessed him with either a moderate or marked degree of impairment in all categories. *Id*.  As noted earlier, the ALJ afforded Dr. Dempsey's report limited weight and relied on the testimony of the treating physician.  R. at 17-18.  A treating physician's opinion generally is favored over that of a consulting physician.  *Talbot*, 814 F.2d at 1463.  "The treating physician rule governs the weight to be accorded the medical opinion of the physician who treated the claimant . . . relative to other medical evidence."  *Kemp*, 816 F.2d at 1476.  The ALJ correctly discounted the weight given to the opinion of Dr. Dempsey, the consulting physician. *Id*.; R. at 17.

43.     The VE's testimony also supported the ALJ's decision.  The VE characterized Mr. Gabaldon's past work as a psych tech as medium and semi-skilled.  R. at 46.  He also characterized the work as a substitute teacher as light and skilled and the work as a drug and alcohol counselor as sedentary and skilled.  R. at 46-47.  The ALJ posed a hypothetical to the VE and asked him whether an individual like Mr. Gabaldon that was of the same age, education, and work history would have acquired any transferable skills.  R. at 47.  Hypothetical questions supported by the record are proper.  *Berna v. Chater*, 101 F.3d 631, 634 (10th Cir. 1996) (holding that vocational expert's opinion--given in response to a hypothetical was proper.) The VE testified that an individual would have acquired the skills in social services and adult care.  R. at 47.

44.     The ALJ then posed another hypothetical to the VE and asked whether there were any jobs that an individual of the same age, same education, same work history, same transferable skills as the Claimant could do.  R. at 48.  The hypothetical was subject to limitations in sitting 30

to 40 minutes at a time, walking two blocks, standing for a short period of time, lifting and

carrying no more than 20 pounds and subject to non-exertional factors such as difficulty in

maintaining concentration, working in an environment or setting where he can work alone or

basically in a small environment without large groups of people to deal with. *Id*. The VE testified

that there were four such jobs including a coin collector, cleaner/housekeeping, ware cleaning,

and light assembly positions including an eyeglass polisher and a lens inserter. R. at 48-50. The

VE testified that the coin collector position was light and unskilled, that the cleaner/housekeeping

position was light and unskilled, that the ware cleaning position  was light and unskilled, that the

eyeglass polisher position was sedentary and unskilled and that the lens inserter position was

sedentary and unskilled. R. at 49-50. The hypothetical posed to the VE incorporated the

limitations of the Claimant. R. at 47-50. The VE's testimony supported the ALJ's finding that

Mr. Gabaldon was not disabled. *Berna*, 101 F.3d at 634. Therefore, the Commissioner met her

burden by relying on Dr. Ortiz's opinion and the VE's testimony in showing that Mr. Gabaldon

retains the residual functional capacity to work. *Hamilton*, 961 F.2d at 1497-1498; *Andrade*, 985

F.2d at 1047.

**Mr. Gabaldon's Fatigue**

45.     Claimant argues that the ALJ erred because Claimant consistently reported fatigue,

which could not be compensated by normal work and meal breaks throughout the day, from April

1997 through January 1999. Although Claimant reported fatigue several times from April 1997

through January 1999, he was never diagnosed with fatigue by any doctor. R. at 221, 233, 244,

262-263, 266, 302, 303. "[If] no medical evidence supports Claimant's allegations of fatigue,

[then] his testimony alone cannot establish a nonexertional impairment." *Hamilton v. Secretary*

*of Health & Human Servs*, 961 F.2d 1495, 1499 (10th Cir. 1992).   *Cf. Talley v. Sullivan*, 908

F.2d 585, 587 (10th Cir.1990) (per curiam) (subjective complaints alone insufficient to establish

disabling pain).   While Claimant's doctors noted his complaints of fatigue, the ALJ found that no

doctor ever confirmed his degree of limitation, and concluded that Mr. Gabaldon's complaints

were not supported by medical evidence and lacked credibility.   R. at 17-18, 221, 233, 244, 262-

263, 266, 302, 303.   Moreover, the ALJ explicitly stated that "the claimant's testimony of

subjective complaints and functional limitations . . . was not supported by the evidence as a whole

in the disabling degree alleged and therefore lacked credibility."   R. at 17.; *See Hamilton*, 961

F.2d at 1500.   The ALJ's finding that Mr. Gabaldon could perform other work despite his

complaints of fatigue is thus supported by substantial evidence.   *Hamilton*, 961 F.2d at 1497-

1498; *Andrade*, 985 F.2d at 1047.

**Unsuccessful Employment**

46.    Claimant also argues that the ALJ did not consider the fact that Mr. Gabaldon did

not successfully maintain employment in the years since the onset of his disability.   Under 42

U.S.C § 423 (d)(2)(A) and 20 C.F.R. § 404.1566 (c)(8), one of the factors that is excluded from

disability evaluation is "not wishing to do a particular type of job."   The staff psychiatrist at

VAMC noted in October 1997 that Mr. Gabaldon had attempted to work part-time but that he

had been fired. R at 235.   Claimant was fired from a job as a substance abuse counselor in 1994

and he was terminated from his job as a substitute teacher in 1997.   While Mr. Gabaldon lost

these jobs, he also admitted to having a negative attitude about being a mental health technician,

teacher, and substance abuse counselor.   R. at 30-32.   Because Mr. Gabaldon admitted to having

a negative attitude, it appeared to the ALJ that he did not wish to do any one of these jobs.   R. at

30-31.  Therefore, pursuant to 42 U.S.C. § 423 (d)(2)(A) and 20 C.F.R § 404.1566(c)(8), the

ALJ did not err in excluding his unsuccessful ability at maintaining employment.

**GAF Scores**

47.     Claimant also argues that his scores on the Global Assessment of Functioning

[GAF] indicated the severity of his problems.  A GAF score is a subjective determination which

represents "the clinician's judgment of the individual's overall level of functioning." *See American*

*Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), (4th ed.

1994) at 30. The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of

severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious

suicidal act with clear expectation of death). The GAF is not an absolute determiner of ability to

work.  *Id*.  Instead, the disability determinations should be made on a case-by-case basis,

considering all the evidence, including GAF ratings.  *Purvis v. Commissioner*, 57 F.Supp. 2d

1088, 1093 (D. Oregon 1999) (discussing a GAF score of 50).  In the case at hand, the ALJ made

a supported individualized assessment of Claimant's abilities and considered all of the evidence in

the record, including the GAF, in reaching her determination that Claimant could do simple and

unskilled light work.  The ALJ based her decision not only on the GAF scores, but also on Mr.

Gabaldon's testimony and the testimony of the vocational expert.  I  find that the ALJ did not err

because she considered all of the Claimant's records in reaching her determination that Claimant

could perform light work.

**Uncontroverted Evidence**

48.     Claimant argues that it was legal error for the ALJ to mention only evidence from

the VA's medical records that support the decision denying benefits and ignore evidence that is

favorable to the claimant's claim that he is disabled.  In addition to discussing the evidence

supporting his decision, the ALJ also must discuss the uncontroverted evidence she chooses not

to rely upon, as well as significantly probative evidence he rejects. *Clifton v. Shater,* 79 F.3d

1007, 1010 (10th Cir. 1996) *citing Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir.1984) ("a

minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which

considerable evidence is presented to counter the agency's position"). Specifically, the Claimant

argues that while the ALJ stated that Mr. Gabaldon reported to his doctors that he does not see

his children fairly frequently, the ALJ failed to discuss the doctor reports that noted that Mr.

Gabaldon had 'little in regular social contact.'  The record must demonstrate that the ALJ

considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.

*Clifton*, 79 F. 3d at 1010.  *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir.

1984). In this case, the ALJ noted that the Claimant testified and reported to the consultative

examiner that he has no social life, that he could not deal with people, and that he avoided people.

R. at 17.  The ALJ also indicated that she could not rely on this evidence because Mr. Gabaldon

inconsistently reported to his doctors that he had several close friends and that his daughters were

a support system for him.  R. at 17.  In an undated disability report, Claimant wrote that he does

no household maintenance, will not leave his house, visits with his duaghters once a week and he

finds time to drive his car.  R. at 123.  On November 10, 1997, Claimant told his counselor,

Kathleen Slattery, that he had a good relationship with his daughters and a solid support system

and that he has several close friends and maintains an amicable relationship with his ex-wife.  R. at

228.  Mr. Gabaldon also reported to Ms. Slattery that he enjoys being alone and often avoids

others.  *Id*.  One month later, however, he told Ms. Slattery that he preferred being alone and

often avoids others, including his children by not answering the phone or door for several weeks at a time.  R. at 225.  On. June 24, 1998, Mr. Gabaldon reversed his position again and told Sharon Connor, a VA nurse that his support systems were the VAMC and his two daughters.  It appeared to the ALJ that this was evidence that was inconsistent.   The  ALJ made the minimal level of articulation in assessing the evidence that was favorable to Mr. Gabaldon and found it to be inconsistent with the evidence that he relied on in pointing out the inconsistency. R. at 17.  *See Clifton*, 79 F.3d at 1010 (*citing Zblewski*, 732 F.2d at 79).   Therefore, there was no legal error.

## RECOMMENDED DISPOSITION

I  recommend that Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 9), filed February 10, 2002, be denied, that the Commissioner's decision be affirmed, and this action be dismissed.  Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C).  Within ten days after a party is served with a copy of these proposed findings and recommendations that party may file with the Clerk of the District Court, 333 Lomas Blvd. NW, Albuquerque, NM  87102, written objections to such proposed findings and recommendations.  A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**